**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ACK FOR WHALES, INC. *et al.*,

*Plaintiffs*,

*v.*

BUREAU OF OCEAN ENERGY MANAGEMENT *et al.*,

*Defendants*,

*and*

VINEYARD WIND 1 LLC,

*Intervenor-Defendant.*

Civil Action No. 1:26-cv-00070

Hon. Tanya S. Chutkan

**REPLY IN SUPPORT OF INTERVENOR-DEFENDANT VINEYARD WIND 1 LLC'S MOTION TO TRANSFER VENUE**

## INTRODUCTION

Vineyard Wind's motion established that the District of Massachusetts—which has now presided over five other matters involving the Vineyard Wind Project—is the more appropriate forum under § 1404(a) for this challenge by Massachusetts-based Plaintiffs to a Massachusetts offshore wind project alleging harm in Massachusetts. The Plaintiffs' opposition rests almost entirely on the fact that federal decisionmakers in the District of Columbia failed to take action to address the Project's alleged impacts in Massachusetts. Although that might make venue *permissible* in the District of Columbia, it does not negate the many private- and public-interest factors supporting Massachusetts's much stronger claim to this dispute. The controversy is "at home" in Massachusetts and it is not impermissible "forum shopping" to have the case decided there. The Plaintiffs are Massachusetts-centered parties alleging Massachusetts-centered injuries from an offshore wind energy Project located off the Massachusetts coast that generates energy for Massachusetts utilities pursuant to agreements approved by the Massachusetts Department of Public Utilities. Other challenges to federal approvals and orders concerning the Project have been and continue to be litigated in the District of Massachusetts. And the Commonwealth and its residents have a substantial interest in the Project's fate. For those reasons, the private- and public-interest factors strongly favor transfer.

### I. The Case-Specific Nexus to Massachusetts Far Outweighs Plaintiffs' Chosen Forum

The Plaintiffs have not claimed that they have any ties to the District of Columbia, and their own Complaint admits that they have substantial ties to Massachusetts. ACK for Whales is a Massachusetts corporation, *see* Compl. ¶ 8; Ex. 2, Dkt. 13-3; and all the individual Plaintiffs reside or own property or businesses in the Commonwealth. Compl. ¶¶ 9–13. Indeed, the very purpose of ACK for Whales is to protect "the cultural and historical heritage of *Nantucket* from the inimical

effects of Vineyard Wind 1." *Id.* ¶ 8 (emphasis added); *cf. Citizen Advocs. for Responsible Expansion, Inc. (I-Care) v. Dole*, 561 F. Supp. 1238, 1239 (D.D.C. 1983) (finding "organization composed of Fort Worth citizens and groups dedicated to improving their city" had "strong ties" to the Northern District of Texas).

None of the Plaintiffs resides in the District of Columbia, and "[t]his court consistently has shown less deference to entities that chose this forum but did not reside here." *Gulf Rest. Net. v. Jewell*, 87 F. Supp. 3d 303, 312 (D.D.C. 2015) (collecting cases). That deference is even *further* "diminished" because Vineyard Wind seeks transfer to the Plaintiffs' "resident forum." *Airport Working Grp. of Orange Cnty., Inc. v. U.S. Dep't of Def.*, 226 F. Supp. 2d 227, 230 (D.D.C. 2002). And Plaintiffs "will not be burdened" by litigating in Massachusetts, as many of them "chose that district as the forum" for their earlier, closely related challenge to federal approvals of the Project. *Reiffin v. Microsoft Corp*., 104 F. Supp. 2d 48, 52 (D.D.C. 2000); *see Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28, 44–45 (D. Mass. 2023), *aff'd*, 100 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1050 (2025). Vineyard Wind's burden is thus a modest one, and the case-specific factors discussed below carry it.

Alleging no personal connection to this District, the Plaintiffs try to anchor venue here on two grounds: that "the relevant decisionmakers are in D.C." and that the case may "implicate significant national policy concerns, including the interpretation of OCSLA." Resp. 5, Dkt. 14. Neither withstands scrutiny.

**1.** In asserting that "the challenged decision here was rendered by federal entities in D.C.," *id.* at 4, the Plaintiffs ignore that federal agency staff in Massachusetts and elsewhere have played key roles in the review and approval of the Project for over a decade. The federal Record of Decision ("ROD") was a joint decision by the Bureau of Ocean Energy Management ("BOEM"),

the Bureau of Safety and Environmental Enforcement, and the U.S. Army Corps of Engineers, made in consultation with several regional and local agencies and entities, such as the Army Corps' New England District, the National Marine Fisheries Service's Greater Atlantic Regional Fisheries Office in Gloucester, Massachusetts, and the Massachusetts Office of Coastal Zone Management ("CZM"). *See* 86 Fed. Reg. 26541 (May 14, 2021); Bureau of Ocean Energy Mgmt. et al., Record of Decision: Vineyard Wind 1 Offshore Wind Energy Project Construction and Operations Plan, at 1 (May 10, 2021) ("ROD"), https://www.boem.gov/renewable-energy/state-activities/final-record-decision-vineyard-wind-1; Decl. of Klaus Skoust Moeller ¶ 8, Dkt. 6-2; *see also Seafreeze Shoreside Inc. v. U.S. Dep't of Interior*, 2022 WL 3906934, at *3–4 (D.D.C. June 27, 2022) (describing involvement of regional offices).

BOEM's Atlantic OCS Office, which oversees leases on the outer continental shelf off the coast of Massachusetts and oversaw the Project's approval, is located in Virginia, not the District of Columbia. *See* Bureau of Ocean Energy Mgmt., *BOEM's Atlantic OCS Region*, https://www.boem.gov/regions/atlantic-ocs-region (last visited July 1, 2026). It is there that BOEM's Program Manager for the Office of Renewable Energy Programs evaluated and certified the Project's compliance with OCSLA, *see, e.g.*, Info. Mem. from James F. Bennett to Amanda Lefton (May 10, 2021), https://www.boem.gov/renewable-energy/state-activities/vw1-ocsla-compliance-memo-rod-appendix-b, executed the challenged Construction and Operations Plan, *see* Vineyard Wind Construction and Operations Plan, Volume I, at 1 (Sept. 30, 2020) ("COP"), https://www.boem.gov/renewable-energy/vineyard-wind-cop-volume-i-complete, received submissions from Vineyard Wind and comments from the public related to the Project, *see, e.g.*, *id.*, and held meetings with Vineyard Wind. The Army Corps' authorization, moreover, was issued

by the New England District, headquartered in Concord, Massachusetts—not by a Washington office. ROD at 1, 49.

Given the breadth of administrative review of the Project, the Plaintiffs' "general descriptions of the involvement of individuals" in the District of Columbia are thus "insufficient to create a substantial factual nexus between this case and the District of Columbia." *City of W. Palm Beach v. U.S. Army Corps of Eng'rs*, 317 F. Supp. 3d 150, 155 (D.D.C. 2018). Rather, a "plaintiff seeking to sue federal defendants in this District must instead demonstrate substantial personalized involvement by a member of the Washington, D.C. agency in order for the court to conclude that there exist meaningful ties to the District." *Id.* at 154 (quoting *Niagara Pres. Coal., Inc. v. FERC*, 956 F. Supp. 2d 99, 105 (D.D.C. 2013)). Plaintiffs offer no evidence to that effect, despite having the opportunity to do so.

Regardless, neither the location of the challenged Record of Decision's execution nor the headquarters of a reviewing agency is dispositive. *Seafreeze*, 2022 WL 3906934, at *7–8; *see also Airport Working Grp.*, 226 F. Supp. 2d at 230 (finding insufficient nexus notwithstanding that "the ROD was signed by a Department of Navy official based in the District of Columbia"). The locations where any intermediate decisions and underlying factfinding occurred, and where the decisions' effects "will be felt," are equally important. *Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 54 (D.D.C. 2012); *see also Airport Working Grp.*, 226 F. Supp. 2d at 230 (finding connection to District of Columbia "overshadowed by the fact that their decisions [for the ROD] were based on work done by government employees in California, public comments received from Orange County residents and organizations, and Orange County land use plans, zoning ordinances and regulations"). Those considerations show a stronger nexus to Massachusetts.

In addition to the aforementioned decisions made *outside* the District of Columbia, the ROD confirms extensive involvement by regional, state, tribal, and local entities throughout the process. BOEM's planning began with an intergovernmental renewable-energy task force composed of "State, local, and tribal governments" and federal agency representatives, and the ensuing consultation led BOEM to remove areas within 12 nautical miles of inhabited coastline from leasing consideration to reduce visual impacts. ROD at 4; *see also* COP at 6-1 to 6-7 (providing full list of meetings with regional stakeholders from April 2015 to July 2018). The federal approvals also depended on state and local compliance determinations, including certification statements by the Massachusetts Department of Environmental Protection ("MassDEP") and the Massachusetts CZM field office. ROD at 47. And the mitigation measures require continuing coordination with, approval by, or reporting to Massachusetts and local entities, including MassDEP, the Massachusetts Division of Marine Fisheries, Massachusetts CZM, the Nantucket Conservation Commission, and the Town of Nantucket. *Id.* at 55–59.

Additionally, BOEM undertook substantial local consultation before issuing the ROD. For example, BOEM distributed the Project's draft environmental impact statement across Massachusetts and held public hearings in four Massachusetts towns; the comments from those hearings became part of the administrative record supporting the final decision. *See* 84 Fed. Reg. 2925 (Feb. 8, 2019); Ex. 1, Dkt. 13-2. Public and state comments also helped shape BOEM's selection of the Project layout, including comments from the Commonwealth of Massachusetts, Mass Audubon, and regional and national conservation organizations. ROD at 24. This case is therefore unlike *Mashpee Wampanoag*, where the challenged decision issued from the agency's headquarters without regional consultation. *See Mashpee Wampanoag Tribe v. Zinke*, 2019 WL 2569919, at *5–6 (D.D.C. June 21, 2019).

The Plaintiffs also are simply incorrect that the Project is located "beyond the bounds of any state." Resp. 5. Beyond the wind turbine generators located offshore, the Project includes onshore landings and a substation located in "Barnstable, Massachusetts that connects the Project to the bulk power grid." Moeller Decl. ¶ 6. What is more, the Plaintiffs' own Complaint confirms that they are challenging BOEM's approval of the Project because of the harms it is allegedly causing Nantucket residents and those who recreate off the Massachusetts coast, *see, e.g.*, Compl. ¶¶ 8–13—and not "in the D.C. area." *Seafreeze*, 2022 WL 3906934, at *7. Simply put, regardless of where the ROD was signed, both its causes and effects lie in Massachusetts. Against that backdrop, this action's spurious connection to the District of Columbia cannot outweigh the substantial case-specific considerations favoring transfer to Massachusetts.

**2.** That the Plaintiffs' claims may implicate "the interpretation of OCSLA" does not supply any "significant national policy concerns" sufficient to defeat transfer either. Resp. 5. There is no "blanket rule that 'national policy' cases should be brought" in the District of Columbia. *Starnes v. McGuire*, 512 F.2d 918, 928 (D.C. Cir. 1974). That is especially the case where, as here, "the particular project and its impacts are local in nature." *Niagara Pres.*, 956 F. Supp. 2d at 105. As noted, all the alleged environmental injuries the Plaintiffs attribute to the Project are localized to Massachusetts and its surrounding waters. Compl. ¶¶ 9–13.

This case therefore bears little resemblance to those relied on by the Plaintiffs. In *Oceana v. Bureau of Ocean Energy Management*, the challenged offshore activity—lease sales for oil and gas operations in "all unleased blocks"—was "spread throughout the Gulf Coast region" in the outer continental shelf and served to bolster national energy reserves. 962 F. Supp. 2d 70, 72, 76–77 (D.D.C. 2013). Vineyard Wind's Project, by contrast, involves substantial operations on the Massachusetts mainland, confines its turbines to a discrete site off the Massachusetts coast,

benefits ratepayers in Massachusetts, and employs Massachusetts residents. *See* Moeller Decl. ¶¶ 4, 6. *Greater Yellowstone* is still further afield. There, plaintiffs challenged regulations affecting winter activities in Yellowstone and Grand Teton National Parks and the John D. Rockefeller Jr. Memorial Parkway, *national* parks—including one spanning multiple States—that are used and enjoyed by citizens from across the Nation. *Greater Yellowstone Coal. v. Kempthorne*, 2008 WL 1862298, at *6 (D.D.C. Apr. 24, 2008). The Plaintiffs' allegations concerning impaired recreation and "views of the horizon" from the Nantucket shoreline for a select few Massachusetts property owners do not raise comparable nationwide concerns akin to the management of National Parks. *See, e.g.*, Compl. ¶¶ 9–11.

The Plaintiffs' reliance on *Mashpee Wampanoag* fares no better. That case concerned a decision alleged to implicate "the sovereignty and security of Tribal Nations, their citizens, and their lands," a paradigmatic matter of national concern. 2019 WL 2569919, at *9; *cf. Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500–01 (1979) (recognizing Congress's "plenary power over Indian affairs"). This case, in contrast, involves a federal permit for a single wind energy project off the coast of Massachusetts. Courts in this District have repeatedly declined to treat challenges to federal permits for local projects as matters for this forum merely because they arise under federal law or concern resources of public importance. *See Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 68 (D.D.C. 2003); *Pres. Soc'y*, 893 F. Supp. 2d at 55. The Plaintiffs' OCSLA claim therefore provides no additional basis for keeping this case in the District of Columbia.

At bottom, the Plaintiffs' invocation of OCSLA and generalized description of decisions made in the District of Columbia do not establish any meaningful nexus to this forum when measured against their ties to Massachusetts. On the other side of the ledger, the Plaintiffs'

allegations of injuries occurring in and adjacent to Massachusetts require that Vineyard Wind's choice of forum receive meaningful weight. *See Gulf Rest. Net.*, 87 F. Supp. 3d at 313 ("In Administrative Procedure Act . . . cases, a defendant's choice of forum deserves some weight where the harm from a federal agency's decision is felt most directly in the transferee district." (cleaned up)). The Plaintiffs themselves have no personal connection to this District; and the case, by their own telling, concerns a Massachusetts-centered Project and Massachusetts-centered harms. Measured against those connections, the asserted nexus to this forum must give way to this case's clear center of gravity in the District of Massachusetts.

## II. The Proximity to Witnesses and Evidence Factors Favor Transfer

Because the Plaintiffs reside in Massachusetts and complain about the impact of the Project in the waters off the coast of Massachusetts, Massachusetts provides a more convenient forum for witnesses and discovery. The Plaintiffs note that discovery is typically not permitted in APA cases. But that limit applies to the merits of the agency's decision; it does not bar discovery into threshold issues such as standing or preclusion. *Cf. Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 187 (D.D.C. 2022) ("When it comes to standing, however, district courts are not limited to the administrative record."). And courts in this District do not disregard the convenience-of-witness and proximity-to-evidence factors merely because a case involves agency action. *See Zhang v. DHS*, 2024 WL 5056357, at *2 (D.D.C. Dec. 10, 2024) (finding transfer favored where the plaintiff would "likely be the key witness" and would rely on personal records); *Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 270–71 (D.D.C. 2018) (finding convenience factors favored transfer where "it stands to reason" that relevant witnesses and records would be located in the transferee district).

Vineyard Wind does not have to accept the Plaintiffs' allegations that they are harmed by the Project. And discovery on that issue would take place in Massachusetts, where many Plaintiffs reside, and would concern Massachusetts-centered facts. This is the second time that ACK for Whales has challenged the federal approval of Vineyard Wind's Project. Its earlier *Nantucket Residents Against Turbines* litigation was filed on behalf of its members, *see* 675 F. Supp. 3d at 44–45, making discovery into its members and alleged injuries directly relevant to questions of standing and preclusion.

## III. The Public-Interest Factors Favor Transfer

The Plaintiffs all but ignore the significant ties to Massachusetts in their attempt to undercut the clear weight of the public-interest factors pointing to the Commonwealth. The "most important" of those factors—the local interest in having local controversies decided at home—decisively favors transfer. *Pres. Soc'y*, 893 F. Supp. 2d at 57 (cleaned up). The remaining public-interest factors point the same way or, at minimum, supply no reason to keep this case in the District of Columbia.

**1.** The strength of the local interests implicated by this case clearly cuts in favor of transfer. As explained, the Project is located in and offshore of Massachusetts and is designed to supply power to Massachusetts. Its operation thus directly impacts Massachusetts residents. *See Pres. Soc'y*, 893 F. Supp. 2d at 57 (finding interest "to be . . . of substantial local interest and controversy in Charleston" where "the citizens of Charleston [would] most clearly feel the effects of the project"). The interest of the Commonwealth itself is perhaps even more compelling.

The Commonwealth has been deeply involved in the development and defense of the Project. It "has been planning for the development of Vineyard Wind's Project for nearly a decade" and has "devoted significant resources to bringing the Project online." Amicus Br. of the

Commonwealth of Mass. at 1, *Vineyard Wind 1 LLC v. U.S. Dep't of Interior*, No. 26-cv-10156 (D. Mass. Jan. 23, 2026), ECF No. 61. As the Commonwealth explained in a recent amicus brief filed in the District of Massachusetts, further interruption of the Project would impair "Massachusetts's sovereign interest in planning for and obtaining affordable and reliable energy," expose "Massachusetts and its ratepayers" to "serious economic injury," jeopardize "6,404 full-time equivalent jobs" and "associated tax revenue," impede "Massachusetts's statutory obligations to procure offshore wind," and deprive Massachusetts of "a valuable tool to protect our territory and residents from the severe environmental and public health harms caused by pollution emitted by fossil fueled energy sources." *Id.* at 2, 9. Those asserted harms are local in the fullest sense: they concern the Commonwealth's sovereign prerogatives, and will impact communities and residents the Commonwealth represents.

The Commonwealth's own involvement in the defense of the Project underscores the particular importance Vineyard Wind holds for Massachusetts and its residents. *Cf. Sierra Club*, 276 F. Supp. 2d at 71 (transferring challenge to federal permits in light of letters from Florida legislators highlighting "the unique importance that the permits hold for . . . Florida"). This is, in every practical and civic sense, a Massachusetts controversy, and it should be adjudicated "within view" of the citizens and officials it will most deeply affect. *Pres. Soc'y*, 893 F. Supp. 2d at 57. The District of Columbia has no comparable sovereign or local stake.

**2.** The Plaintiffs' judicial-efficiency arguments similarly hold no water. Their assertion that the District of Massachusetts "takes more than four times longer to resolve civil cases than does this Court" comes from a 2019 opinion relying on 2018 data. Resp. 13 (quoting *Mashpee Wampanoag*, 2019 WL 2569919, at *8). The updated data tell a different story: while the District of Massachusetts had slightly more filings in 2025, it reached a disposition in civil cases in less

time than the District of Columbia.[1] Additionally, this action remains in its infancy and the Plaintiffs identify no prejudice that would result from transfer before dispositive briefing has begun.[2] *See Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 19 (D.D.C. 1996) (finding no delay would result from transfer of a case "in its earliest stages"). At a minimum, docket conditions supply no reason to prefer this District over the forum with the stronger connection to the Project, the parties, and the related litigation.

**3.** With respect to the transferee forum's "familiarity with the governing laws" and the pendency of related actions in that forum, the Plaintiffs commit the familiar mistake of assuming that "the D.D.C. is more familiar with APA litigation" than courts in its sister circuits. Resp. 12. That argument is directly foreclosed by this District's oft-cited principle that "[a]ll [federal] courts are presumed to be equally [capable of] applying federal law." *See, e.g.*, *Sheffer v. Novartis Pharms. Corp.*, 873 F. Supp. 2d 371, 379 (D.D.C. 2012) (citing *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987)). What matters more here is each court's "knowledge of the parties," "familiarity with these facts," and experience with "the law as applied to these facts." *Pueblo v. Nat'l Indian Gaming Comm'n*, 731 F. Supp. 2d 36, 40 (D.D.C. 2010) (cleaned up). On that score, the District of Massachusetts has the advantage: it has entered final

---

[1] *See* Admin. Off. of U.S. Cts., *U.S. District Courts – Federal Court Management Statistics–Profiles*, at 2, 4 (Dec. 31, 2025), https://www.uscourts.gov/sites/default/files/document/fcms_na_distprofile1231.2025.pdf.

[2] Vineyard Wind moved to intervene before the Federal Defendants had even appeared, *compare* Intervenor-Def.'s Mot. to Intervene, Dkt. 6 (Feb. 20, 2026), *with* Defs.' Notice of Appearance, Dkt. 8 (Mar. 10, 2026), and promptly moved to transfer within three weeks of becoming a party to this action on June 4, 2026. *See* Order Granting Intervenor-Def.'s Unopposed Mot. to Intervene (June 4, 2026). This timeline belies any suggestion by the Plaintiffs that Vineyard Wind's actions are either untimely or cause for delay. *Cf.* Resp. 6.

judgment on four prior challenges to the Project and is now presiding over Vineyard Wind's challenge to BOEM's December 22, 2025 stop-work order.[3]

The Plaintiffs accuse Vineyard Wind of attempting to "collapse every challenge previously filed against the project into one singular controversy." Resp. 8. But it is the Plaintiffs who first drew the connection between this action and the controversy surrounding BOEM's December 22, 2025 stop-work order. Their Complaint purports to be based on the "same radar degradation that prompted the suspension" order. Compl. ¶ 19. To litigate that issue in two courts would not only run the risk of yielding inconsistent results but also breed the "wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960).

Moreover, the District of Massachusetts is already intimately familiar with the very facts and legal issues underlying the Plaintiffs' claims. In *Seafreeze*, the District of Massachusetts rejected the exact same reading of OCSLA that the Plaintiffs put forth here—as applied to the exact same Project. *Compare Seafreeze*, 2023 WL 6691015, at *21 ("Plaintiffs argue that, as a matter of statutory construction, 43 U.S.C. § 1337(p)(4) imposes certain non-negotiable requirements that Defendants failed to provide for in consideration of the Vineyard Wind COP"), *with* Compl. ¶ 27 ("Pursuant to 43 U.S.C. § 1337(p)(4) . . . BOEM failed to ensure that each and every mandatory criterion is satisfied[.]").[4] While the Plaintiffs may wish to have that question

[3] *See Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28, 41 (D. Mass. 2023), *aff'd*, 100 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1050 (2025); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 2023 WL 6691015 (D. Mass. Oct. 12, 2023) (consolidated action), *aff'd*, 123 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2681 (2025); *Melone v. Coit*, 2023 WL 5002764 (D. Mass. Aug. 4, 2023), *aff'd*, 100 F.4th 21 (1st Cir. 2024); *Vineyard Wind 1 LLC v. U.S. Dep't of Interior*, No. 26-cv-10156 (D. Mass. filed Jan. 15, 2026).

[4] In an attempt to muddle the identity of the legal issues, the Plaintiffs point to "the withdrawal of Solicitor Anderson's M-Opinion and reinstatement of Jorjani's M-Opinion via the Zerzan M-Opinion in May, 2025" as abrogating that interpretation. Resp. 8. Not so. Both the *Seafreeze*

relitigated elsewhere, that preference supplies no basis to discount the District of Massachusetts's familiarity with the Project and the application of OCSLA to it.

## CONCLUSION

For these reasons, Intervenor-Defendant Vineyard Wind 1 LLC respectfully asks this Court to grant the motion to transfer venue and transfer this case to the U.S. District Court for the District of Massachusetts.

Date: July 2, 2026

Respectfully submitted,

*/s/ Peter C. Whitfield*
Peter C. Whitfield (D.C. Bar No. 984225)
Richard W. Smith (D.C. Bar No. 465563)
Matthew Brewer (D.C. Bar No. 493939)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
pwhitfield@sidley.com
rwsmith@sidley.com
mbrewer@sidley.com

Brooklyn Hildebrandt (D.C. Bar No. 888325011)
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
(213) 896-6007
bhildebrandt@sidley.com

*Counsel for Vineyard Wind 1 LLC*

---

opinion and the Department of Interior's M-37059 guidance reach the same interpretation of OCSLA: Section 1337(p)(4) imposes mandatory criteria, but it does not require each criterion to be satisfied to its absolute maximum or forbid every reasonable interference with other OCS uses. *See Seafreeze*, 2023 WL 6691015, at *22; U.S. Dep't of Int., M-37059, at 2, 15 (Dec. 14, 2020). And even if there *were* a conflict, the agency's interpretation of OCSLA would not be entitled to any deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions.").

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 2nd day of July 2026, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on Plaintiffs' and Defendants' counsel of record via the Court's electronic filing system.

Dated: July 2, 2026

*<u>/s/ Peter C. Whitfield</u>*
Peter C. Whitfield